IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 24-CR-00228-GKF |
| | ) |
| DANIEL DUANE SMITH, JR., | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter comes before the court on the Motion to Dismiss the Indictment [Doc. 18] of defendant Daniel Duane Smith, Jr. For the reasons set forth below, the motion is granted.

**I.      Background/Procedural History**

On July 15, 2024, a grand jury returned an Indictment charging Mr. Smith with one count of Felon in Possession of a Firearm and Ammunition pursuant to 18 U.S.C. §§ 922(g)(1) and 924(a)(8). [Doc. 2]. Section 922(g)(1) provides as follows: "It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1). The Indictment alleges that Mr. Smith knowingly possessed a Ruger, Model EC9S, 9mm caliber pistol, serial number 459-72430, and seven rounds of 9mm caliber ammunition, knowing that he had previously been convicted of at least one of the following crimes, punishable by imprisonment for terms exceeding one year:

1. Felon in Possession of Firearm and Ammunition, Case No. 08-CR-206-001-CVE, in the United States District Court for the Northern District of Oklahoma, on April 7, 2009;

2. DUI Drugs & Alcohol – Second Offense, Case No. CF-2018-40, Tulsa County, State of Oklahoma, on May 22, 2018;

    3.    Unlawful Possession of Controlled Drug, Case No. CF-2008-4518, Tulsa County, State of Oklahoma, on September 23, 2009;

    4.    Home Repair Fraud, Case No. CF-2004-2182, Tulsa County, State of Oklahoma, on October 27, 2004; and

    5.    Home Repair Fraud, Case No. CF-2004-2092, Tulsa County, State of Oklahoma, on October 27, 2004.

[Doc. 2].

Mr. Smith seeks to dismiss the Indictment, arguing that 18 U.S.C. § 922(g)(1) violates his constitutional right to bear arms as set forth in the Second Amendment to the U.S. Constitution. [Doc. 21]. The government filed a response in opposition [Doc. 19].

## II.    Second Amendment Jurisprudence

Prior to considering the parties' arguments, it is necessary to understand the "still-developing area" of Second Amendment jurisprudence, a field "still in the relatively early innings." *United States v. Rahimi*, 602 U.S. —, 144 S. Ct. 1889, 1923 (2024) (Kavanaugh, J., concurring).

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the U.S. Supreme Court recognized that the Second Amendment "protect[s] an individual right to keep and bear arms for self-defense." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022); *see also Heller*, 554 U.S. at 595 ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms.").[1] However, the Court also recognized that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited," and stated that, "nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions

---

[1] In *McDonald v. City of Chicago,* 561 U.S. 742 (2010), the Supreme Court held that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment, such that the right applies to the States.

on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," all of which were "presumptively lawful." *Heller*, 554 U.S. at 626-27, 627 n.26.

In light of the *Heller* decision, in *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009), the Tenth Circuit considered a constitutional challenge to § 922(g)(1).  In a published decision, the Tenth Circuit rejected the constitutional challenge, reasoning, "[t]he Supreme Court . . . explicitly stated in *Heller* that 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'"  *McCane*, 573 F.3d at 1047.  Thus, *McCane* "foreclose[d]" any argument that § 922(g)(1) violated the Second Amendment.  *See United States v. Gieswein*, 887 F.3d 1054, 1064 n.6 (10th Cir. 2018).

Things remained much the same until the Supreme Court issued its decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022).  There, the Court began by noting that, "[i]n the years since [*Heller* and *McDonald*], the Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny."  *Bruen*, 597 U.S. at 17.  However, the Court rejected the two-part means-ends test, reasoning it was "one step too many."  *Id.* at 19.  Instead, the Court articulated the relevant inquiry, stating:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 24.  To determine whether a firearms regulation is "consistent with the Nation's historical tradition of firearm regulation," the *Bruen* Court stated that district courts should consider

"whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 27.

The Court recognized that the inquiry will often require "reasoning by analogy" and "[l]ike all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar,'" including both in "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 28-29. Significantly, however, the Court stated that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30 (emphasis in original).

As recognized by Justice Barrett, "[c]ourts . . . struggled with this use of history in the wake of *Bruen*." *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring). For this court's part, the court applied the historical analysis as set forth in *Bruen* and concluded that "§ 922(g)(1) is 'consistent with the Nation's historical tradition of firearm regulation' and the statute" was not facially unconstitutional. *United States v. Coombes*, 629 F. Supp. 3d 1149, 1160 (N.D. Okla. 2022); *United States v. Mayfield*, 660 F. Supp. 3d 1135 (N.D. Okla. 2023). However, the court permitted an as-applied challenge. *See United States v. Forbis,* 687 F. Supp. 3d 1170, 1176-79 (N.D. Okla. 2023).

But, as recognized by Chief Judge Heil, "opinions by well-respected judges reach[ed] conflicting conclusions" and "a circuit split [was] developing on the issue." *United States v. Nakedhead,* No. 23-CR-109-JFH, 2023 WL 5277905, at **2, 2 n.2 (E.D. Okla. Aug. 16, 2023).

In the midst of the historical surveys, on September 15, 2023, the Tenth Circuit Court of Appeals issued the published decision in *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023). Therein, the Circuit considered whether *Bruen* had overruled *McCane*. Recognizing that *Bruen* "created a test" that "didn't exist when [it] decided *McCane*," the Circuit stated "the emergence of

a new test doesn't necessarily invalidate . . . earlier precedent." *Vincent,* 80 F.4th at 1200. Rather, the Circuit concluded it was obligated to apply its prior precedent and could not "jettison *McCane*" unless *Bruen* "indisputably and pellucidly abrogated" it. *Id.*

Looking to *McCane*, the Circuit characterized its decision as "rel[ying] solely" on the language in *Heller* describing felon dispossession statutes as "presumptively lawful." *Id.* at 1201. Noting that six of the nine Justices had reaffirmed language in *Heller* that it was not "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons" and, further, that the Court had apparently approved of "shall-issue" regimes and background checks, the Circuit concluded that *Bruen* "did not indisputably and pellucidly abrogate our precedential opinion in *McCane*." *Id.* at 1201-02. Thus, *Bruen* did not overrule *McCane* and, in the Tenth Circuit, § 922(g)(1) was not facially unconstitutional. *Id.* at 1202.

Further, the Circuit stated that, "[u]nder *McCane*, we have no basis to draw constitutional distinctions based on the type of felony involved." *Id.* at 1202. Rather, "*McCane* . . . upheld the constitutionality of the federal ban for *any* convicted felon's possession of a firearm." *Id.; see also In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009) ("We have already rejected the notion that *Heller* mandates an individualized inquiry concerning felons pursuant to § 922(g)(1)."). Thereafter, district courts in this Circuit uniformly applied the Tenth Circuit's precedential decision in *Vincent* to reject both facial and as-applied constitutional challenges to § 922(g)(1). *See, e.g., United States v. Gaines*, No. 23-10121-JWB, 2024 WL 2260938 (D. Kan. May 17, 2024); *United States v. Montoya*, No. 21-CR-00997-KWR, 2024 WL 1991494, at *3 (D.N.M. May 6, 2024) (internal citation omitted) ("Despite the Defendant's arguments about how other courts have decided § 922(g)(1), *Vincent* clearly states that § 922(g)(1) remains constitutional after *Bruen.* Even while *Vincent* is being appealed, this Court is obligated to apply the precedent of the Tenth

Circuit."); *United States v. Girty*, No. 24-CR-031-JFH, 2024 WL 1677718 (E.D. Okla. Apr. 17, 2024); *United States v. Mumford*, No. CR-24-10-F, 2024 WL 1183673, at *1 (W.D. Okla. Mar. 19, 2024) ("[C]ontrolling Tenth Circuit authority leaves the court no room for consideration of the constitutionality of § 922(g)(1) either on its face or as considered in light of the nature of the predicate felony offense.").[2]

On June 21, 2024, the U.S. Supreme Court issued its opinion in *Rahimi,* which considered the constitutionality of 18 U.S.C. § 922(g)(8). There, the Court recognized that "some courts have misunderstood the methodology" of *Heller* and *Bruen*, which "were not meant to suggest a law trapped in amber." *Rahimi,* 144 S. Ct. at 1897. The Court articulated the Second Amendment constitutional test to require lower courts to consider "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 1898 (emphasis added). Specifically, the court must "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding

---

[2] The court particularly notes the decision of fellow U.S. District Judge John D. Russell, who explained:

> If this Court had a blank slate on which to write this Opinion, it would, by necessity, follow the *Bruen* analysis and consider whether the mere possession of a handgun and ammunition is protected Second Amendment activity (it is) and whether, in this case, the Government has demonstrated that the restriction set forth in § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation (it has not). But the slate is not blank. The Tenth Circuit has spoken, and, in doing so, has unequivocally declared that its decision in *McCane* remains good law. This Court will follow that guidance, which, as the concurrence in *McCane* recognizes, is how it should be – even if the practice leaves open the possibility that the law would have been better served if the regulations *Heller* addressed in dicta had been left to later cases.

*United States v. Gaskey*, — F. Supp. 3d —, 2024 WL 1624846, at *3 (N.D. Okla. Apr. 15, 2024) (internal citations and quotations omitted).

generation to modern circumstances.'" *Id.* (quoting *Bruen,* 597 U.S. at 26-31). The Court reiterated that "a 'historical *twin*' is not required," *Rahimi,* 144 S. Ct. at 1903 (quoting *Bruen,* 597 U.S. at 30), because even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen,* 597 U.S. at 30).

Having reviewed the history of American gun regulations, the Court recognized that, "[f]rom the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Rahimi*, 144 S. Ct. at 1899. Specifically, the Court pointed to (1) surety laws and (2) "going armed" laws. *Id.* at 1899-901. Surety laws "targeted the misuse of firearms" and "provided a mechanism for preventing violence before it occurred." *Rahimi*, 144 S. Ct. at 1900. In contrast, "going armed" laws "provided a mechanism for punishing those who had menaced others with firearms" through "forfeiture of the arms . . . and imprisonment." *Rahimi,* 144 S. Ct. 1900-01. Thus, the Court held:

> Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed. Section 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be. Its prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent.
>
> Like the surety and going armed laws, Section 922(g)(8)(C)(i) applies to individuals found to threaten the physical safety of another. This provision is "relevantly similar" to those founding era regimes in both why and how it burdens the Second Amendment right. Section 922(g)(8) restricts gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws do. Unlike the regulation struck down in *Bruen*, Section 922(g)(8) does not broadly restrict arms use by the public generally.

*Rahimi,* 144 S. Ct. 1901 (internal citations omitted).

Although not purporting to "undertake an exhaustive historical analysis . . .of the full scope of the Second Amendment," the Court concluded, "[a]n individual found by a court to pose a

credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Rahimi,* 144 S. Ct. at 1903.

Less than two weeks later, on July 2, 2024, the U.S. Supreme Court granted certiorari in *Vincent v. Garland*, vacated the judgment, and remanded the matter to the Tenth Circuit for further consideration in light of *Rahimi*. *Vincent v. Garland,* — S. Ct. —, 2024 WL 3259668 (July 2, 2024).

On August 5, 2024, the Tenth Circuit received the Judgment of the U.S. Supreme Court, recalled the mandate issued in *Vincent*, and vacated its prior judgment. *Vincent v. Garland*, No. 21-4121 (10th Cir. Aug. 5, 2024), [Doc. 010111089964]. The Circuit has set a briefing schedule, directing the parties to file supplemental briefs addressing the impact of *Rahimi.*

### III.   Analysis

Mr. Smith argues that § 922(g)(1) is unconstitutional as applied to him.[3] In response, the government first argues (1) *McCane* forecloses Mr. Smith's challenge and (2) § 922(g)(1) is constitutional as applied to Mr. Smith. Thus, it is first necessary to consider the status of the *McCane* decision in light of the foregoing Second Amendment jurisprudence.

  A.   *Status of McCane and Vincent*

The government argues that, despite the order granting certiorari, vacating judgment, and remanding (GVR) in *Vincent*, neither *Bruen* nor *Rahimi* abrogated *McCane* and *McCane* forecloses Mr. Smith's challenge. [Doc. 19, pp. 9-11].

The Supreme Court has stated that a GVR "is appropriate when 'intervening developments . . . reveal a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a

---

[3] Mr. Smith does not assert a facial challenge to § 922(g)(1). *See* [Doc. 18].

redetermination may determine the ultimate outcome' of the matter." *Wellons v. Hall*, 558 U.S. 220, 225 (2010) (quoting *Lawrence v. Chater,* 516 U.S. 163, 167 (1996) (per curiam)).  Although "[t]he GVR order is not equivalent to reversal on the merits, nor is it 'an invitation to reverse,'" it does require the Circuit (and this court) to determine whether *Rahimi* "compels a different resolution" of *Vincent*.  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 845 (6th Cir. 2013).

As discussed above, in *Vincent,* the Circuit characterized *McCane* as having "relied solely on. . . language from *Heller*." *Vincent,* 80 F.4th at 1201.  Thus, despite recognizing the two-step test articulated in *Bruen*, the court did not apply it.  Rather, the Circuit focused on whether anything in *Bruen* cast doubt on *Heller*'s language or "the constitutionality of longstanding prohibitions on possession of firearms by convicted felons." *Vincent,* 80 F.4th at 1201.

Having reviewed *Rahimi*, the court concludes that it compels a different resolution of *Vincent*.  Specifically, in *Rahimi,* the Supreme Court recognized that "some courts have misunderstood the methodology of [its] recent Second Amendment cases." *Rahimi,* 144 S. Ct. at 1897.  In response to such misunderstandings, the Court repeatedly emphasized that its Second Amendment precedent "direct[s] courts to examine our 'historical tradition of firearm regulation' to help delineate the contours of the right." *Id*.  "A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances,'" with "why and how the regulation burdens the right" being "central to th[e] inquiry." *Id.* at 1898; *see also id.* at 1910 (Gorsuch, J., concurring) ("Among all the opinions issued in this case, its central messages should not be lost.  The Court reinforces the focus on text, history, and tradition, following exactly the path we described in *Bruen*.").

In *Vincent*, the Tenth Circuit did not conduct a historical inquiry. It did not consider the "central" inquiry of "why and how" § 922(g)(1) burdens a convicted felon's Second Amendment right. *Rahimi,* 144 S. Ct. at 1898. Instead, the Circuit relied solely on *Bruen*'s consideration of *Heller*'s language regarding "longstanding prohibitions" that are "presumptively lawful." *Vincent,* 80 F.4th at 1201-02. In doing so, the Tenth Circuit "stretch[ed]" *Heller*'s words "beyond their context." *Rahimi,* 144 S. Ct. at 1910 (Gorsuch, J., concurring). *Rahimi* requires that the court "examine our 'historical tradition of firearm regulation'" to "ascertain whether [§ 922(g)(1)] is 'relevantly similar' to laws that our tradition is understood to permit" and therefore compels a different result. *Rahimi,* 144 S. Ct. at 1897-98; *see also United States v. Duarte*, 101 F.4th 657, 668 (9th Cir. 2024), *rehearing en banc granted and vacated by,* 108 F.4th 786 (9th Cir. 2024) ("'Simply repeat[ing] *Heller*'s language' about the 'presumptive[] lawful[ness]' of felon firearm bans will no longer do after *Bruen*."); *United States v. Morgan*, No. 23-10047-JWB, 2024 WL 3890184, at *4 (D. Kan. Aug. 21, 2024) (saying of the *Vincent* GVR Order, "[t]he court interprets that as indicating that the Supreme Court means what it says: the constitutionality of laws regulating the possession of firearms under the Second Amendment must be evaluated under the *Bruen* framework"). Thus, *McCane* does not foreclose Mr. Smith's challenge.

B.   As Applied Challenge

"A facial challenge considers the restriction's application to all conceivable parties, while an as-applied challenge tests the application of that restriction to the facts of a plaintiff's concrete case." *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1248 (10th Cir. 2023) (quoting *iMatter Utah v. Njord*, 774 F.3d 1258, 1264 (10th Cir. 2014)). The distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). "[I]t does not speak at all to the substantive

rule of law necessary to establish a constitutional violation," and therefore the same substantive constitutional analysis applies. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019); *see also Gross v. United States,* 771 F.3d 10, 14-15 (D.C. Cir. 2014) ("[T]he substantive rule of law is the same for both challenges."). Accordingly, the court must consider whether § 922(g)(1), as applied to Mr. Smith, is consistent with the Second Amendment. That is, whether permanently disarming Mr. Smith is "consistent with the Nation's historical tradition of firearm regulation," including "how and why" § 922(g)(1) burdens Mr. Smith's "right to armed self-defense." *Bruen*, 597 U.S. at 24, 28-29.

The government first argues that categorically disarming felons does not implicate the Second Amendment because the right extends only to "ordinary, law-abiding, adult citizens." [Doc. 19, pp. 12-13]. However, this court has previously declined to carve-out felons from the Second Amendment's protection of "the people." *United States v. Coombes*, 629 F. Supp. 3d 1149, 1156 (N.D. Okla. 2022); *see also United States v. Williams*, — F.4th —, 2024 WL 3912894, at *7 (6th Cir. Aug. 23, 2024). Further, the Ruger constitutes an "arm" within the Second Amendment's protection and, by allegedly possessing same, Mr. Smith "kept" the weapon. *See Heller,* 554 U.S. at 582 ("[T]he most natural reading of 'keep Arms' as an individual right unconnected with militia service."). Thus, the Second Amendment presumptively protects Mr. Smith's conduct and the government must "justify [§ 922(g)(1)] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

The government directs the court to historical sources that it contends support the categorical disarmament of all or most felons. However, this court has previously recognized that "[s]impy lumping all felons together is insufficient." *Forbis,* 687 F. Supp. 3d at 1177. Further, the government fails to explain how § 922(g)(1) "is 'relevantly similar'" to the cited sources.

*Rahimi,* 144 S. Ct. at 1898.

For example, the government points to Founding-era laws punishing felonies by death or civil death and states "[g]iven the restrictions the Founders could and did impose on felons as a general matter, restricting the firearms rights of most convicted felons is consistent with the Nation's tradition of firearm regulation." [Doc. 19, p. 20]. However, as recognized by then-Circuit Judge Amy Coney-Barrett, "[t]he premise of this argument—that the states permanently extinguished the rights of felons, either by death or operation of law, in the eighteenth and nineteenth centuries—is shaky" and "[b]y the time the Constitution was ratified, James Wilson observed that while the term 'felony' was once 'very strongly connected with capital punishment,' that was no longer true." *Kanter v. Barr*, 919 F.3d 437, 458-59 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Thus, "[b]ecause they did not go hand-in-hand, the argument that the severity of punishment at the founding implicitly sanctions the blanket stripping of rights from all felons, including those serving a term of years, is misguided." *Kanter*, 919 F.3d at 461. Further,

> [t]hat Founding-era governments punished some nonviolent crimes with death does not suggest that the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition. The greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed.

*Range v. Att'y Gen. United States of America*, 69 F.4th 96, 105 (3d Cir. 2023), *vacated, Garland v. Range*, 144 S. Ct. 2706 (2024). Likewise, "civil death applied exclusively to life sentences and only if authorized by statute—and even then, it was more modest than the ancient version because the convict retained some rights. Felons serving a term of years did not suffer civil death; their rights were suspended but not destroyed." *Kanter*, 919 F.3d at 461. Thus, "[t]he obvious point

that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society." *Id.* at 462.

The government points to three statutes that disarmed persons who had committed offenses not punishable by death—specifically, not attending a service of the Church of England, "base" and "opprobrious" speech, and "libel[ing] or defam[ing]" certain colonial resolutions. It suggests that the statutes are evidence of the constitutionality of disarming all persons who commit felonies. As previously stated, "[w]hy and how the regulation burdens the right are central" to the court's inquiry, including whether the challenged and historical law address comparable societal problems. *See Rahimi*, 144 S. Ct. at 1898; *Bruen*, 597 U.S. at 27-30. Recognizing that the law need only "comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin,'" *Rahimi,* 144 S. Ct. at 1898, the government has nevertheless not shown that § 922(g)(1) is directed to addressing relevantly similar societal problems as the cited historical analogues. Unlike § 922(g)(1), which is directed to disarmament of persons convicted of certain crimes, the cited historical analogues were directed to disarming certain religious and racial minorities, as well as crimes "inimical to the liberties of this Colony [Connecticut] and the other United Colonies in America." Thus, the statutes are not strong evidence that disarmament of all felons—regardless of the crime of conviction—"comport[s] with the principles underlying the Second Amendment." *Rahimi,* 144 S. Ct. at 1898.

Finally, the government argues that a tradition exists of "disarming those who were deemed to present a special danger if armed" [Doc. 19, p. 21], and that Mr. Smith constitutes such a person.

As an initial matter, the government argues that the court's inquiry is not limited to the facts of the indictment but, instead, the court should consider all "relevant" facts and

circumstances. [Doc. 19, p. 25]. Specifically, the government asks the court to consider "circumstances under which he was found with the gun in this case." [Doc. 19, pp. 25-26]. In support, the government cites the recent decision of the U.S. Court of Appeals for the Third Circuit in *United States v. Moore*, 111 F.4th 266 (3d Cir. 2024), wherein the Circuit reasoned:

> [A]n as-applied challenge requires us to ask whether a statute's "application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (cleaned up). "In order to mount a successful as-applied challenge, [defendant] must show that under these particular circumstances he was deprived of a constitutional right." *Id*. at 406 (cleaned up). And "these particular circumstances" include facts beyond the predicate offenses alleged in the indictment. So the circumstances of a criminal offense can justify rejecting an as-applied challenge to a conviction regardless of whether they were charged. This is especially so where, as here, no party questions the fact that we deem constitutionally relevant: [Defendant] was on supervised release when he possessed the firearm.

*Moore*, 111 F.4th at 272-73. However, *Moore* is distinguishable.

In *Moore,* defendant Diontai Moore was convicted in 2013 of possession of a firearm by a felon in violation of § 922(g)(1) and sentenced to sixty months imprisonment followed by a three-year term of supervised release, a condition of which was a prohibition on possession of a firearm or ammunition. *Moore,* 111 F.4th at 267-68. While on supervised release, Mr. Moore was involved in a shooting and subsequently charged with felon in possession of a firearm in violation of § 922(g)(1). *Id.* at 268. Mr. Moore pled guilty, but preserved his appellate rights with respect to the constitutionality of § 922(g)(1). *Id.* On appeal, the Third Circuit framed the relevant issue as "[d]oes a convict completing his sentence on supervised release have a constitutional right to possess a firearm?" *Moore,* 111 F.4th at 267. Mr. Moore argued that "his status as a supervised releasee cannot support his felon-in-possession conviction" because it was not alleged in the indictment, but Mr. Moore did not dispute that he was on supervised release when he possessed the firearm. *Id.* at 272-73. Under the circumstances, the Circuit considered Mr. Moore's

supervised release status, which it "deem[ed] constitutionally relevant," and ultimately held "[c]onsistent with our Nation's history and tradition of firearms regulation, . . . convicts may be disarmed while serving their sentences on supervised released"—that is, while completing their criminal sentence. *Id.* at 271-73.

As previously stated, "[w]hy and how the regulation burdens the right are central" to the court's determination of "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi,* 144 S. Ct. at 1898. In *Moore*, the fact that Mr. Moore was on supervised release at the time of the offense was "constitutionally relevant" to "why" Mr. Moore constituted a prohibited person. *Moore,* 111 F.4th at 271-73. That is, the fact that he was on supervised release at the time he possessed the firearm justified his disarmament. Here, however, the government does not argue that any of the factual circumstances surrounding Mr. Smith's alleged possession of the Ruger, standing alone, justify his disarmament. Rather, the government points to his prior felony convictions as alleged in the Indictment. Thus, the circumstances under which Mr. Smith was allegedly found with a gun do not bear on why § 922 (g)(1) burdens Mr. Smith's constitutional right to bear arms and therefore the circumstances surrounding the alleged possession are not constitutionally relevant.

Further, Mr. Smith has pled not guilty to the charged offense. [Doc. 8]. Thus, unlike in *Moore*, Mr. Smith disputes the proffered facts. *Cf. Moore*, 111 F.4th at 273 (noting the court could consider uncharged facts "especially so where, as here, no party questions the fact that we deem constitutionally relevant"). Instead, Mr. Smith asserts only that the Indictment is "defective under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for failure to state an offense on the basis that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him because the prior felonies alleged in the Indictment do not satisfy the requirement set out in [*Bruen*]." [Doc. 18, p. 2]. Thus, Mr. Smith

"ask[s] 'whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offence,'" *United States v. Pope,* 613 F.3d 1255, 1260 (10th Cir. 2010) (quoting *United States v. Todd*, 446 F.3d 1062, 1068 (10th Cir. 2006)), and "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *Pope,* 613 F.3d at 1259 (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)).

Finally, and most significantly, this court is bound to apply Tenth Circuit precedent. *See United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990) ("A district court must follow the precedent of this circuit."). In a published, precedential decision related to an as-applied constitutional challenge to § 922(g)(1), the Tenth Circuit held that courts may consider facts outside the indictment to determine a pretrial motion to dismiss "in the 'limited circumstances' where '[1] the operative facts are undisputed and [2] the government fails to object to the district court's consideration of those undisputed facts,' and [3] the district court can determine from them that, '*as a matter of law*, the government is incapable of proving its case beyond a reasonable doubt.'" *Pope*, 613 F.3d at 1260 (quoting *United States v. Hall*, 20 F.3d 1084, 1088 (10th Cir. 1994)). As previously stated, the government's proffered facts in this matter are disputed and therefore the court is precluded from considering same. Thus, in resolving Mr. Smith's motion to dismiss, the court must limit itself to the allegations of the Indictment. *Hall*, 20 F.3d at 1087.

This court has previously concluded that "'the historical record' demonstrates 'that the public understanding of the scope of the Second Amendment was tethered to the principle that the Constitution permitted the dispossession of persons who demonstrated that they would present a danger to the public *if armed*.'" *Forbis*, 687 F. Supp. 3d at 1178 (quoting *United States v. Harrison*, 654 F. Supp. 3d 1191, 1198 (W.D. Okla. 2023)) (emphasis added); *see also Rahimi,* 144 S. Ct. at 1902 ("Our tradition of firearm regulation allows the Government to disarm individuals

who present a credible threat to the physical safety of others.").

The government contends that Mr. Smith's prior conviction for Unlawful Possession of Controlled Drug "demonstrates that allowing him to possess a gun would pose a danger to public safety" and therefore the Constitution permits dispossession. [Doc. 19, p. 24]. Courts across the country have recognized that drug *trafficking* and drug *distribution* are "closely related" to violence. *See United States v. Alaniz,* 69 F.4th 1124, 1130 (9th Cir. 2023) ("[D]rug trafficking plainly poses substantial risks of confrontation that can lead to immediate violence."); *United States v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014) ("[D]rug trafficking . . . [is] frequently associated with violence."); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) ("[D]rug dealing is notoriously linked to violence."); *United States v. Barton,* 633 F.3d 168, 174 (3d Cir. 2011) (recognizing that drug trafficking is "closely related to violent crime"), *overruled on other grounds, Binderup v. Att'y Gen. United States of America*, 826 F.3d 336 (3d Cir. 2016); *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) ("Drug crimes are associated with dangerous and violent behavior."); *United States v. Martinez*, 938 F.2d 1078, 1083 (10th Cir. 1991) ("[C]ourts have recognized the high level of violence that is not uncommonly associated with the drug distribution business."). Further, firearms are consistently recognized as "tools of the [drug] trade." *Martinez*, 938 F.2d at 1083; *see also United States v. Twaddle*, No. 20-2128, 2021 WL 5122282, at *5 (10th Cir. Nov. 4, 2021) ("[F]irearms are 'tools of the trade' in drug trafficking, an industry in which violence . . . abound[s].").

However, the government has not shown that drug *possession* is similarly linked to violence such that Mr. Smith would "present a danger to the public *if armed.*" *Forbis*, 687 F. Supp. 3d at 1178. Rather, the government points to evidence of higher recidivism rates amongst illegal drug users and that eighteen percent of federal inmates claim to have committed their

offenses to obtain money for drugs. [Doc. 19, p. 24]. The court has previously rejected such evidence as irrelevant to the *Bruen* inquiry and "unmoored from the Nation's history and tradition, unrelated to [defendant's] past conduct, and unrelated to [the] possession of a firearm." *Forbis*, 687 F. Supp. 3d at 1178; *see also Forbis*, 687 F. Supp. 3d at 1178 (quoting *Harrison*, 654 F. Supp. 3d at 1178) ("[S]tripping a person's fundamental rights based on projected crimes untethered from past dangerous actions is a risky game indeed."). Thus, the government has not satisfied its burden to show that permanently dispossessing Mr. Smith based on his prior Unlawful Possession of Controlled Drug conviction is "consistent with the Nation's historical tradition of firearm regulation."

The government next points to Mr. Smith's conviction for DUI Drugs & Alcohol – Second Offense and asserts that the conviction "flags him as dangerous." [Doc. 19, p. 24]. However, the court previously rejected a similar argument and sees no reason to revisit its prior conclusion. *Forbis,* 687 F. Supp. 3d at 1178.

The government offers no specific argument or historical evidence or analogues with respect to Mr. Smith's prior convictions for Felon in Possession of Firearm and Ammunition or Home Repair Fraud. Nor is the court satisfied that convictions demonstrate that Mr. Smith presents a danger to the public if armed. *Forbis*, 687 F. Supp. 3d at 1178. Further, the government contends that Smith "has also marked himself as dangerous by committing five total felonies," but offers no historical support for the proposition. [Doc. 19, p. 24]. Rather, as set forth above, the *Bruen* inquiry appears to turn on the danger to the public presented if defendant were armed based on the relevant circumstances—his prior convictions—rather than the number of offenses. *United States v. Forbis*, — F. Supp. 3d —, 2024 WL 3824642, at *5 (N.D. Okla. Aug. 14, 2024).

Thus, for the reasons set forth herein, the government has not satisfied its burden to show

that a lifetime prohibition against possession of firearms based on Mr. Smith's prior convictions as set forth in the Indictment is "consistent with the Nation's historical tradition of firearm regulation." *Bruen,* 597 U.S. at 27.  Thus, the Indictment must be dismissed.

## IV.     Conclusion

WHEREFORE, the Motion to Dismiss the Indictment [Doc. 18] of defendant Daniel Duane Smith is granted.

IT IS SO ORDERED this 10th day of September, 2024.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE